In re the MARRIAGE OF Tracy Ann FREEL and Neal Von Ahsen.

Upon the Petition of Tracy Ann Freel, Appellee,

And Concerning Neal Marvin Von Ahsen, Appellant.

No. 88–1322.

Supreme Court of Iowa.

Nov. 22, 1989.

Rehearing Denied Dec. 18, 1989.

Leslie Babich of Babich, Bennett, Nickerson & Newlin, Des Moines, for appellant.

Deborah McKittrick and Kolleen K. Samek, Des Moines, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, CARTER and NEUMAN, JJ.

HARRIS, Justice.

The equities in this case strongly favor a woman who seeks visitation rights with the young boy to whom she is closely knit in bonds of affection. Although not related to him, she nurtured the boy in the role of a mother during five years she lived with his father. Under the controlling legal principles we are obliged to hold she cannot be awarded visitation. We reverse a trial court ruling to the contrary.

It is difficult to imagine a father less deserving of a veto power over visitation. Approximately two months prior to the birth of Travis Von Ahsen, Neal Von Ahsen married Travis's mother. She was suffering from lupus and died approximately six weeks after Travis's birth. Neal also has two children from a previous marriage. Those children live with their mother.

In June of 1982, Neal met Tracy Freel. After dating for three months, Neal, Tracy, and nine-month-old Travis moved into a home together. Neal and Tracy never married. Neal worked as an over-the-road

truck driver and was away from home several days a week. On Neal's petition the court, in 1984, appointed Tracy to be legal guardian of Travis. Neal wanted to insure that Tracy could legally act in his absence should an emergency arise.

Tracy never adopted Travis. The couple was advised against it due to the fact that Travis would lose social security benefits stemming from his mother's death. Neal and Tracy had two daughters of their own. For more than five years Tracy provided the day-to-day care for the family.

In April of 1987 the parties' relationship ended. Tracy left the household to give birth to the couple's second child and instead of returning home she moved in with her parents. Neal took Travis to his parents' home in the Amana Colonies. In August of 1987, Neal's new girlfriend (now his wife) moved into the home. Travis rejoined his father at this time.

We emphatically agree with the trial court in finding that Tracy has earned visitation rights with Travis. We also agree that visitation would be to Travis's advantage. The bonding which took place between them during the crucial years of Travis's early childhood clearly evolved into a de facto mother and son relationship.

To describe the family unit in which this relationship existed we cannot improve on the words of the trial court, and adopt them as our own:

> Travis resided with [Tracy] from September of 1982 when he was nine-months old, until June of 1987. [Tracy] was awarded physical care of his [Travis's] half-sisters.... [They] have been raised together. [Neal] has a history of not visiting his children; therefore, Travis would not likely see his half-sisters unless [Tracy] was granted visitation with him. There is a strong bond between Travis and [Tracy]. It would definitely be in his best interests to grant visitation rights to [Tracy].

The procedural background of the case is only of incidental importance because the only issue on appeal is Tracy's right to visitation with Travis, and the answer turns on whether the court had authority to order it. After the parties separated Tracy filed for dissolution of marriage. She alleged a common-law marriage existed and requested custody of Travis and both girls. Neal petitioned in probate court to remove Tracy as Travis's guardian. The matters were consolidated and tried together.

The trial court found no common-law marriage and granted Neal sole custody and physical care of Travis. The court went on to determine that Tracy acted *in loco parentis* to Travis and found it was in Travis's best interests that visitation be granted. Visitation was fixed. The trial court granted Tracy and Neal joint custody of their two daughters, with Tracy having physical care of them. Neal was granted reasonable rights of visitation with the daughters and was ordered to pay child support and to maintain certain insurance for them.

The question, then, becomes whether the court held the power to order visitation. Our past cases, where someone other than a parent has sought visitation rights with a child, have been limited to grandparents. There is little in the precedents to encourage Tracy. For example, *Olds v. Olds*, 356 N.W.2d 571 (Iowa 1984), involved two separate disputes; both were attempts by maternal grandparents to establish visitation with their grandchildren over the protests of the grandchildren's mothers. We agreed there were only two possible bases for such a claim: common law or statute. *Id.* at 572. Citing cases from New Jersey and Illinois, we said there was no common-law authority for granting visitation to a grandparent over the protest of a custodial parent. *Id.* at 572–73. A rule to the contrary, we said, "would divide and thereby hamper proper parental authority, force the child into the midst of a conflict of authority between parent and grandparent, and coerce what should remain a moral rather than a legal obligation." *Id.* at 573.

In the absence of statute it seems to be the general rule that a custodial parent holds veto power over visitation rights of

anyone except the other parent.[1] *See* 67A C.J.S. *Parent and Child* § 41(c) at 296 (1978) ("[G]enerally where custody of a child has been awarded to a fit parent . . . third persons are not entitled to visitation privileges. . . ."); 59 Am.Jur.2d *Parent and Child* § 36 at 177 (1987).

As was apparent in *Olds*, Iowa has modified the common-law veto power of a custodial parent in situations where a grandparent seeks visitation privileges. Iowa's statute, Iowa Code § 598.35 (1989), is notable in that the modification extends only to grandparents. Often statutory modifications of the common-law prohibition extend to a wider group. *See e.g.* Utah Code Ann. Sec. 30–3–5 (". . . [V]isitation rights of parents, grandparents *and other relatives* shall take into consideration the welfare of the child.") (emphasis added).

We must assume the legislature acted deliberately in limiting outside visitation privileges to grandparents. *Barnes v. Dep't of Transp.*, 385 N.W.2d 260, 263 (Iowa 1986) (". . . [L]egislative intent is expressed by omission as well as inclusion. The express mention of certain conditions of entitlement implies the exclusion of others.").

Tracy sees support in our opinion *In re Guardianship and Conservatorship of Ankeney*, 360 N.W.2d 733 (Iowa 1985). *Ankeney* involved visitation privileges of a child by his maternal grandmother. The boy's mother had been killed in a car accident and his father, since remarried, served as the little boy's conservator. The father freely consented to visitation until the father's actions as conservator were challenged by the boy's uncle (brother of the boy's deceased mother). It was indicated that the father, without court permission, had used conservatorship funds to purchase a home for family use. Later a .649% of the interest in the house was conveyed to the boy. The father then terminated visitation with the boy's maternal grandmother.

Our majority in *Ankeney* determined that visitation should be fixed for the grandmother, stating in part: "The authority of the probate court to grant access of the ward to a grandparent arises from the child's best interests rather than from a statutory or common-law right possessed by the grandparent." *Id.* at 737.

The quoted language, upon which Tracy relies, must be read in context. We took care to point out that our *Ankeney* holding was limited to its facts. *Id.* at 735. ("We hold the probate court has authority to direct the guardian's action and, *under the limited facts of this case*, properly exercised such authority.") (Emphasis added.)

One important fact in *Ankeney* was that the visitation was sought by a grandmother, a member of the class to whom visitation privileges had been allowed by our legislature. We did not, by the language Tracy cites, suggest that we were expanding the category of those eligible for visitation beyond that fixed by the legislature.

Tracy's relationship with Travis, in terms of bonds of affection, is strong indeed. But it is based on neither affinity (in any legal sense) or consanguinity. Even though the equities strongly favor Tracy's request, courts are without authority to grant it.

We reverse the judgment of the trial court and remand the case for an order consistent with this opinion.

REVERSED AND REMANDED.

---

1. We do not suggest what Tracy's rights would be if she and Neal had been married during the period they lived together. Authorities, interpreting various statutes, are divided on the question of whether a former stepparent, standing *in loco parentis*, is entitled to visitation privileges. *See* Annot. 1 A.L.R. 4th 1270 (1980).