**Upon the Petition of James Michael ASH, Appellee,**

**And Concerning, Andrea Lynn Kotecki, Appellant.**

No. 92–1482.

Supreme Court of Iowa.

Oct. 20, 1993.

Catherine Zamora Cartee and Patricia Zamora, Davenport, for appellant.

John Wunder, Muscatine, for appellee.

Considered by HARRIS, P.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.

LAVORATO, Justice.

In this paternity proceeding, the district court determined that James Michael Ash was the "equitable parent" of a child born to Andrea Lynn Kotecki. The district court reached this decision on the basis that such a determination was in the best interests of the child. The district court determined that James was the equitable parent of the child despite the fact that James was not the biological parent. Nor was James ever married to Andrea. James' relationship with the child stems from the mother's cohabitation with him several months before and twelve months after the birth of her child.

The decisive issue in this appeal by the mother is whether we should recognize the equitable parent doctrine. Because there is no basis for adoption of such a doctrine under our common law and statutes, we decline to embrace it. We reverse the district court's decision to the contrary.

I. *Background Facts.*

James was twenty-five and Andrea was seventeen when they met in the spring of 1985. At the time, Andrea was having difficulties at home. Because of those difficulties Andrea moved in with James and his girlfriend. In August James asked Andrea and his girlfriend to leave; they did.

Andrea did not fare well on her own. She called James and asked if she could come back; he agreed provided she finish high school. At the time Andrea was in the eleventh grade.

About three weeks after Andrea returned to James' home, they began having sexual intercourse for the first time. Sometime in September Andrea informed James of her pregnancy via a note. Although the evidence is not clear on whether James knew he was not the father, the district court "believe[d] that James did not really feel the child was his or at least had a very strong suspicion it was not his."

The child was born February 1, 1986. James took Andrea to the hospital and was there when the child was born. There is no father listed on the birth certificate; however, the document does carry James' last name. Andrea signed the certificate in her maiden name.

Several days after the birth, Andrea asked for a paternity affidavit. A social worker's report shows that James signed such an affidavit on February 3. James testified he (1) was given the affidavit and a mailing envelope and (2) mailed the affidavit to the bureau of vital statistics. The bureau has been unable to locate the affidavit.

James and Andrea lived together until February 1987. During this time, James assisted in caring for the child. He (1) bathed and fed her, (2) changed her diapers, and (3) provided psychological, emotional, and financial support. James continues to provide health and dental insurance for the child. Medical claim forms for the child

show that Andrea listed the child with James' insurance.

James continued regular visitation with the child even after he and Andrea ended their relationship. He bought the child clothing and toys and paid for her dance lessons. Since 1990 James has paid the child's tuition for preschool.

Since Andrea left the second time, James has helped her financially at various times. He has paid her rent and has bought her groceries when she was out of money. This financial help was in addition to the $35–$50 per week James was voluntarily paying Andrea for the child's support, support sums that Andrea herself set.

James' regular visitation with the child ended in July 1991. On July 15, 1991, Andrea—now married and living in Illinois—cut off visitation in a letter to James. In the letter Andrea told James she did not want him to see the child anymore. She implored him to "get on with your life" and "have a family and children of your own." Andrea told the child James was not her biological father. The child was now five years old.

## II. *Background Proceedings.*

In an effort to restore visitation with the child, James filed suit in August 1991. In it he asked that he be (1) adjudicated as the natural father of the child, (2) awarded reasonable visitation, and (3) ordered to pay a reasonable amount of child support.

Andrea moved to quash service on jurisdictional grounds regarding all three issues. The district court, Judge Edward B. de Silva, Jr., granted the motion regarding visitation and child support. Applying the provisions of Iowa Code chapter 598A (Uniform Child Custody Jurisdiction Act), the court declined to exercise jurisdiction on these two issues. But the court denied the motion as to paternity, concluding that (1) the child and James had a significant contact with Iowa and (2) no other state would have jurisdiction to decide this issue. *See* Iowa Code §§ 598A.3(1)(b) and (d) (1991).

During the pendency of these proceedings, Andrea filed a paternity action in Illinois. The man she named as the biological father did not contest, resulting in an order establishing him as the child's father. James had no notice of the Illinois proceedings.

Following a hearing on the paternity issue here, the district court, Judge Max R. Werling, determined that James,

> by reason of having become the psychological parent and having stood in a position of in loco parentis with this child, has become a person to whom the doctrine of "equitable parent" applies and that the respondent, Andrea Lynn Kotecki, should be and is hereby estopped from denying that parentage.

## III. *Equitable Parent Doctrine.*

This indeed is an unusual case. The usual scenario is that a putative father is denying paternity to avoid paying child support. In this reverse situation, James—although not even a putative father—embraces fatherhood, acknowledges his obligation for support, and desires visitation with the child.

■ Given our case law, we can easily understand why James chose the paternity route to secure what to him are precious visitation rights with the child. Custodial parents have a common law veto power over visitation between the child and all other third parties, except the noncustodial parent. *Lihs v. Lihs,* 504 N.W.2d 890, 891 (Iowa 1993) (minor children of deceased's second marriage have no common law or statutory right to visitation with minor children of deceased's first marriage); *In re Marriage of Freel,* 448 N.W.2d 26, 27–28 (Iowa 1989) (woman who had lived with child and his father for five years but was not child's biological mother had no common law or statutory right to visitation with child after ceasing to live with father); *Olds v. Olds,* 356 N.W.2d 571, 574 (Iowa 1984) (maternal grandparents were without any common law or statutory right to petition for visitation with grandchildren when their own daughter had custody of grandchildren).

■ The only exception to the common law rule is a statutory one that allows grandparents visitation under limited circumstances specified in the statute. *See* Iowa Code § 598.35. In *Olds,* the grandparents

were denied visitation because they did not fit into any of the situations described in the statute. *Olds,* 356 N.W.2d at 573.

This court, in *Olds,* cited sound policy reasons for limiting visitation with third parties other than a noncustodial parent. Such a limitation

demonstrates a respect for family privacy and parental autonomy. The rule recognizes that the government is ill-equipped to dictate the details of social interaction among family members. It also recognizes that the parenting right is a fundamental liberty interest that is protected against unwarranted state intrusion.

*Id.* at 574. *Olds* also noted that courts which give a custodial parent veto power do so "on the basis that judicial enforcement of visitation would divide and thereby hamper proper parental authority, force the child into the midst of a conflict of authority and ill feelings" between the parent and other persons, and "coerce what should remain a moral rather than legal obligation." *Id.* at 573.

We have even rejected a best interest of the child argument for inferring a general intent from the section 598.35 grandparent visitation statute to extend visitation to other third parties. *Lihs,* 504 N.W.2d at 893. We did so because

we would have no clear guidelines as to where such visitation should stop. For example, claims for visitation could arise from siblings, aunts, uncles, and other persons with special relationships. With so many potential petitioners, a court would have to decide which petitioners are more deserving of visitation than others, and how much time each petitioner should receive with the child. It could be chaotic, at best, assigning so many diverse visitations to an already limited number of weekends and holidays.

*Id.*

James hopes to avoid Andrea's veto power as to his desire for visitation by elevating his status to that of a "parent" through a judicially created fiction in the guise of the equitable parent doctrine. If he were successful, we have no doubt that his next step would be to petition the Illinois courts for visitation. This is a reasonable assumption given that his purpose in filing this action originally was to restore the visitation that Andrea abruptly cut off.

In applying the equitable parent doctrine the district court relied heavily on *Atkinson v. Atkinson,* 160 Mich.App. 601, 408 N.W.2d 516 (1987). In *Atkinson,* the wife denied her husband was the biological father of a child born during the marriage. Blood tests confirmed the husband was not the biological father. The issue arose out of a custody dispute in a divorce action. The Michigan court of appeals adopted the doctrine of equitable parent, finding that

a husband who is not the biological father of a child born or conceived during the marriage may be considered the natural father of that child where (1) the husband and child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support. We hold that the husband may be considered the "equitable parent" under these circumstances and remand this case in order to allow the [trial] court to reevaluate custody and visitation, treating [the husband] as a natural parent of [the child].

*Atkinson,* 160 Mich.App. at 608, 408 N.W.2d at 519.

For several reasons, we think the district court incorrectly relied on the equitable parent doctrine. First, Michigan case law recognizes that a stepparent who is not the biological father may be considered a natural parent against his will and be required to pay child support. This was a significant factor in the *Atkinson* court's decision. The logical extension of this holding is that under certain circumstances, a stepparent who is not the biological father of a child may be considered a natural parent when the stepparent (1) desires such recognition, (2) is willing to support the child, and (3) desires to have the reciprocal rights of custody or visitation af-

forded to a natural parent. *Id.* at 609, 408 N.W.2d at 520.

In contrast, Iowa case law recognizes that a stepparent cannot be considered a natural parent against the stepparent's will and cannot be required to pay child support. *In re Marriage of Holcomb,* 471 N.W.2d 76, 78 (Iowa App.1991) (estoppel could not form basis for ordering support for stepchild in dissolution decree); *Mears v. Mears,* 213 N.W.2d 511, 518 (Iowa 1973); *In re Marriage of Carney,* 206 N.W.2d 107, 112 (Iowa 1973). *But see Whitlock v. Iowa Dist. Court,* 497 N.W.2d 891, 893 (Iowa 1993) (ordering stepparent to pay *temporary* child support, relying on the use of the word *party* in Iowa Code section 598.11 on temporary orders during the pendency of dissolution proceedings). The logical extension of our case law is that a stepparent is not treated as a natural parent and is, therefore, not entitled to visitation. *See In re Marriage of Freel,* 448 N.W.2d at 27–28.

Second, in the legal sense, James is a stranger to the child. He is an interested third party. He is not the child's biological father. He is not her adoptive father. He is not her stepfather. He is not her foster parent. He never married the child's mother. He is merely a man who lived with—and cared for—her mother, and who, understandably, became smitten with fatherhood after the child's birth. So James does not even meet the *Atkinson* definition of equitable parent.

It is apparent that James loves the child. He treats her like his daughter. He has, since her birth, assumed the responsibilities and—until his visitation was cut off—enjoyed the privileges of fatherhood. Up to the time visitation was interrupted, James and the child unquestionably enjoyed an appropriate, nurturing, father-daughter relationship.

Nevertheless, James has no legal basis for asserting parental status. This conclusion is consistent with our recent holdings in the three visitation cases cited earlier, *Lihs, Freel,* and *Olds.* In those cases, several third parties outside the realm of legitimate claimants sought visitation with children with whom they had some special relationship. And, while we sympathized with their plight, we consistently refused to grant visitation. The reason was simple: absent any statutory or common law authority authorizing such relationships, our courts lack the power to order visitation in such circumstances.

The same constraints and policy reasons cited earlier in *Olds* and *Lihs* apply with equal force to questions of paternity. In the final analysis, we find no statutory or common law basis for James' paternity claim. Straining to legitimize such an action under current law would foster a superfluity of claims by parties who shared a special relationship with children based neither upon affinity nor consanguinity.

Another court, when faced with a claim similar to James', observed that

> expanding the definition of a "parent" in the manner advocated by appellant could expose other natural parents to litigation brought by child-care providers of long standing, relatives, successive sets of stepparents or other close friends of the family. No matter how narrowly we might attempt to draft the definition, the fact remains that the status of individuals claiming to be parents would have to be litigated and resolution of these claims would turn on elusive factual determinations of the intent of the natural mother, the perceptions of the children, and the course of conduct of the party claiming parental status. By deferring to the legislature in matters involving complex social and policy ramifications far beyond the facts of the particular case, we are not telling the parties that the issues they raise are unworthy of legal recognition. To the contrary, we intend only to illustrate the limitations of the courts in fashioning a comprehensive solution to such a complex and socially significant issue.

*Nancy S. v. Michele G.,* 228 Cal.App.3d 831, 840, 279 Cal.Rptr. 212, 219 (1991). *See also In re Marriage of Goetz & Lewis,* 203 Cal. App.3d 514, 519–20, 250 Cal.Rptr. 30, 33 (1988) (legislature better equipped to expand law to recognize "equitable parent" doctrine); *In re Marriage of O'Brien,* 13 Kan.App.2d 402, 407–10, 772 P.2d 278, 283–84 (1989) (rejecting equitable parent claim by mother's

former husband in paternity proceeding); *Zuziak v. Zuziak,* 169 Mich.App. 741, 751, 426 N.W.2d 761, 766 (1988) (declining to extend holding of *Atkinson* to child custody dispute between mother and stepmother; stepmother, however, granted custody on other grounds); *In re Z.J.H.,* 162 Wis.2d 1002, 1018–1020, 471 N.W.2d 202, 209 (1991) (rejecting custody claim, apparently under in loco parentis doctrine, by adoptive parent's former partner for lack of statutory basis). *But cf. Lipiano v. Lipiano,* 89 Md.App. 571, 576, 598 A.2d 854, 857 (1991) (apparently leaving open recognition of "equitable parent" doctrine at some future point under Maryland law; court refused to apply doctrine to husband who was not biological father of child born during marriage where there were no exceptional circumstances sufficient to overcome custody presumption in favor of biological mother and father); *In re Marriage of D.L.J.,* 162 Wis.2d 420, 429–430, 469 N.W.2d 877, 881 (Wis.App.1991) (apparently reaffirming "equitable parent" theory to estop mother from seeking declaration in divorce proceeding that her husband was not her child's natural father). No matter how noble some of these claims might be, they remain, at least for now, untenable in our jurisprudence.

IV. *Disposition.*

We find no statutory or common law basis for James' claim of paternity. We reverse the district court's erroneous ruling that James is the child's equitable parent. We remand for an order dismissing James' petition.

**REVERSED AND REMANDED WITH DIRECTIONS.**