Upon the Petition of Douglas
G. BRUCE, Appellee,

and

Concerning Elizabeth Sarver, Appellant.

No. 93–1109.

Supreme Court of Iowa.

Sept. 21, 1994.

Kathy P. Ryman of Legal Aid Soc. of Story County, Nevada, for appellant.

Luis Herrara of Herrara Law Office, P.C., Des Moines, for appellee.

David J. Welu of Welu & Welu Law Office, Redfield, for minor child.

Considered by McGIVERIN, C.J., and LARSON, CARTER, SNELL, and ANDREASEN, JJ.

ANDREASEN, Justice.

In this case the petitioner seeks visitation or custody of a child born out of wedlock. The respondent mother moved to dismiss because the petitioner is not the father of the child. The district court granted her motion.

On appeal, we transferred the case to the Iowa Court of Appeals who then reversed and remanded the case to the district court. *Bruce v. Sarver*, 472 N.W.2d 631, 632 (Iowa App.1991). On remand the district court found that although the blood test results establish petitioner is not the biological father of the child, the mother is estopped from denying his paternity. The court awarded custody of the child to the mother with visitation rights to the petitioner. Because we find the petitioner had no legally cognizable relationship to the child, we reverse and remand.

I. *Background.*

In January 1982, Elizabeth Sarver (Elizabeth), age twenty-one, was living in an apartment with her two daughters of a dissolved marriage. She was receiving ADC and Title XIX benefits for the children, then ages three and five. Douglas Bruce (Douglas), age thirty-three, was unmarried, employed in his family's business, and living in his home. Elizabeth and Douglas engaged in a sexual relationship in early 1982. Elizabeth became pregnant. When Douglas asked if the child was his, Elizabeth said she was not sure. Ayla Rachel Elizabeth Repp (Ayla) was born in October 1982. Because they believed Douglas could be the father, he was treated as the father of the child. Douglas did not want Ayla on ADC and he voluntarily provided medical insurance and child support for Ayla.

Douglas wanted to know if Ayla was his daughter, so he arranged for blood tests to be conducted. Approximately six months after Ayla's birth, a blood test was conducted by the Minneapolis War Memorial Blood Bank. The test results, dated June 30, 1983, concluded that Douglas was not a biological parent of Ayla.

Apparently the parties decided the test might be in error, so they continued acting as if Douglas were the father. Although the intimate relationship between Douglas and Elizabeth ended in 1984, Douglas continued to have regular visitation with Ayla, including holidays and vacation trips with his family. He continued to provide child support and other financial assistance for Ayla. A father-daughter relationship developed.

In 1987 Douglas married a woman with two children. He adopted one of her daughters. He also asked Elizabeth for permission to adopt Ayla. Although permission to adopt was denied, Douglas continued to enjoy visitation with Ayla.

In the summer of 1990, Elizabeth stopped visitation for a thirty-day "cooling off" period in an attempt to encourage changes she believed were necessary. Douglas was providing clothing and gifts for Ayla's use when she was with him and his family. She was called Rachel Bruce by Douglas and his family. Elizabeth learned of these facts when she attended a swimming meet where Ayla was entered as Rachel Bruce and was wearing a jacket with this name on it.

When Elizabeth stopped visitation, Douglas instituted this suit by filing a petition for visitation. Later the petition was amended to request custody, child support, and to change her last name to Bruce. Douglas alleged in the petition that he was the natural father of Ayla.

Upon remand the district court bifurcated the proceedings; the first phase was solely to make a finding on paternity of the child, the second was to address issues of custody and visitation. Over the objection of Douglas, the court ordered another blood test. A second blood test report dated September 10, 1992, conducted by Memorial Blood Center of Minneapolis, was returned prior to the second phase of the trial.

The court's decision in the paternity phase of the trial was entered on December 30, 1992. Evidence of the first blood test results were admitted by the court to show its effect on the parties' later conduct, and evidence

relating to the second blood test was admitted over the objection of Douglas. Although the blood tests showed no possibility that Douglas is the father of Ayla, the court estopped Elizabeth from denying Douglas' paternity. The court ordered that Douglas have temporary visitation and that he pay temporary child support of $750 per month pending resolution of the custody phase of the trial. Elizabeth's motion to vacate the order of temporary visitation and support was denied by the court and a guardian ad litem was appointed. Ayla refused to cooperate with visitation apparently because Douglas was challenging her mother's right to custody.

In the custody and visitation phase of the bifurcated trial, the court determined that Elizabeth should retain custody of Ayla and Douglas should continue to have visitation rights. The court's decree entered in June 1993 ordered Douglas to pay child support of $675 per month and ordered Elizabeth to seek counseling for Ayla to assist in reestablishing the relationship with Douglas. When Douglas failed to make a support payment, Elizabeth sought to enforce the court ordered support by asking that he be cited in contempt. Before hearing on the charge, Douglas made the required child support payments and Elizabeth dismissed her application for contempt.

Elizabeth appeals the court's decision estopping her from denying Douglas' paternity, granting him visitation with the child, and the ordering of counseling. Douglas cross-appeals the trial court's award of custody to Elizabeth and seeks custody of Ayla for himself. He argues that Elizabeth waived her right to appeal by seeking to enforce the court's decree and by accepting child support payments. The guardian ad litem filed a brief requesting that the court make a determination of paternity and urging that it is in the child's best interest to remain in the physical custody of her mother with reestablishment of regular visitation with Douglas.

## II. *Scope of Review.*

Upon remand to the district court, this case was tried in equity. Therefore, our review is de novo. Iowa R.App.P. 4. Under de novo review we are not bound by the factual findings of the trial court, but do give them weight. Iowa R.App.P. 14(f)(7).

## III. *Blood Tests.*

Douglas argues that testimony relating to the second blood test was improperly admitted into evidence by the court. He claims that the blood tests were ordered pursuant to what is now Iowa Code section 600B.41 (1993) (formerly section 675.41). This section allows a trial judge to order parties to a paternity action to submit to blood testing for paternity and provides for admission of the test results into evidence. This statute states in part:

600B.41 Blood and Genetic Tests.

1. In a proceeding to establish paternity in law or in equity the court may on its own motion, and upon request of a party shall, require the child, mother, and alleged father to submit to blood or genetic tests.

2. If a blood or genetic test is required, the court shall direct that inherited characteristics, including but not limited to blood types, be determined by appropriate testing procedures, and shall appoint an expert qualified as an examiner of genetic markers to analyze and interpret the results and to report to the court.

3. Verified documentation of the chain of custody of the blood specimen is competent evidence to establish the chain of custody. The testimony of the court-appointed expert at trial is not required.

4. A verified expert's report shall be admitted at trial.

Douglas argues that the testimony relating to the blood test is inadmissible because the results of the blood tests were not sent to the court or properly verified. He contends that the chain of custody of the blood samples was not properly demonstrated.

Section 600B.41 was intended by the legislature as an aid to permit parties in a paternity suit to admit reports of blood test results into evidence without requiring the testimony of the court-appointed expert. *State ex rel. Buechler v. Vinsand,* 318 N.W.2d 208, 210 (Iowa 1982) ("The provision for pretrial

objections to the test procedures and validity is intended to allow the trustworthiness of the evidence to be determined before trial *to obviate the necessity of personal testimony by the blood analyst.*") (emphasis added). Douglas cites *State ex rel. Hodges v. Fitzpatrick,* 342 N.W.2d 870 (Iowa App.1983), in support of his proposition that the results of the blood test are not admissible unless the test results are reported to the court and documentation of the chain of custody is verified. In *Hodges,* the court found the expert's report was inadmissible because the statute requires the expert to "report to the court" the results of the examination. *Id.* at 873. Because section 600B.41 was intended as a vehicle for admitting blood tests without testimony of the expert, the reporting and verification requirements must be satisfied if the blood test report is to be admitted at trial. *Id.*

■ However, section 600B.41 does not impose additional foundational requirements for the admission of expert *testimony* at trial. Dr. Polesky, director of the Memorial Blood Center of Minneapolis (previously Minneapolis War Memorial Blood Bank), an undisputed expert in paternity testing, testified at trial via telephone. When testimony of an expert is offered at trial, the statutory reporting and verification requirements are not applicable. When a proper foundation is established, the court may admit expert testimony and reports of the blood test results.

We find sufficient foundation for the admission of the expert's opinion and reports offered at trial. The blood tested was that of Ayla, Elizabeth and Douglas. The procedures for collection, transportation and testing of the blood were reliable. The failure of the paternity clerk to certify one of the forms when the blood was drawn was satisfactorily explained by her testimony at trial. The testimony at trial sufficiently established the chain of custody of the blood specimens.

Elizabeth argues that the blood test results constituted conclusive evidence of Douglas' nonpaternity. Dr. Polesky testified the blood test results are conclusive proof that Douglas is not the biological father of Ayla. Other states have recognized that blood tests showing a zero probability of paternity are conclusive evidence of nonpaternity as a matter of law. *See, e.g., Krokstrom v. VanDolah,* 826 S.W.2d 402, 403 (Mo.Ct.App.1992); *Symonds v. Symonds,* 385 Mass. 540, 546, 432 N.E.2d 700, 704 (1982); *V.L.P. v. J.S.S.,* 407 A.2d 244, 248 (Del.Fam.Ct.1978). *See also* John P. Ludington, Annotation, *Admissability and Weight of Blood–Grouping Tests in Disputed Paternity Cases,* 43 A.L.R.4th 579, § 8 (1986). Other states have adopted statutes that provide the blood test is conclusive evidence of nonpaternity. *See, e.g.,* Del.Code Ann. tit. 13, § 810(h) (1993); Idaho Code § 7–1116(5) (Supp.1994); Ind.Code Ann. § 31–6–6.1–8(c) (Burns Supp.1994); Mont.Code Ann. § 40–5–234(3)(a) (1993); Tenn.Code Ann. § 24–7–112(b)(1) (Supp.1994); Wis.Stat.Ann. § 767.48(4) (West 1993).

Iowa has not adopted a statute that provides that blood and genetic tests are conclusive evidence of nonpaternity. This court has twice declined to hold blood tests are conclusive evidence of nonpaternity as a matter of law. *In re Estate of Hawk v. Lain,* 329 N.W.2d 660 (Iowa 1983); *In re Marriage of Schneckloth,* 320 N.W.2d 535 (Iowa 1982).

In *Schneckloth,* this court recognized the "highly persuasive" nature of blood tests on the issue of nonpaternity. *Schneckloth,* 320 N.W.2d at 538. We cited with approval *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981), which noted "[t]he powerful if not conclusive nature of blood grouping tests that exclude paternity." *Schneckloth,* 320 N.W.2d at 538.

Here, the blood tests show no possibility that Douglas could be the father of Ayla. Although this fact is highly persuasive, we again find that it is unnecessary to hold that the tests are conclusive. In addition to the blood test results, Elizabeth testified she was in another relationship with an undisclosed man during the period of conception. Elizabeth told Douglas she was unsure who the father was when she became pregnant. Douglas' name was not listed on Ayla's birth certificate. Also, there is no legal presumption of paternity arising from the circumstances in this case.

## IV. *Third–Party Visitation.*

We have repeatedly held that custodial parents have a common law veto power over visitation between the child and all other third parties, except the noncustodial parent. *Petition of Ash,* 507 N.W.2d 400, 404 (Iowa 1993); *Lihs v. Lihs,* 504 N.W.2d 890, 891 (Iowa 1993); *In re Marriage of Freel,* 448 N.W.2d 26, 27–28 (Iowa 1989); *Olds v. Olds,* 356 N.W.2d 571, 574 (Iowa 1984). The only exception to the common law rule is a statutory rule allowing grandparents visitation under limited circumstances enumerated by statute. *See* Iowa Code § 598.35; *Olds,* 356 N.W.2d at 573.

There are several policy reasons supporting a limitation on visitation by third parties other than the noncustodial parent. In *Olds* we noted that the limitation

> demonstrates a respect for family privacy and parental autonomy. The rule recognizes that the government is ill-equipped to dictate the details of social interaction among family members. It also recognizes that the parenting right is a fundamental liberty interest that is protected against unwarranted state intrusion.

*Id.* at 574. We have also expressed concern that an attempt to judicially enforce visitation rights by third parties

> would divide and thereby hamper proper parental authority, force the child into the midst of a conflict of authority and possible ill feelings between parent and other persons, and coerce what should remain a moral obligation rather than a legal one.

*Lihs,* 504 N.W.2d at 892. We have refused to expand visitation rights to third parties whenever visitation would be in the best interest of the child because to do so would leave us with "no clear guidelines as to where such visitation should stop." *Id.* at 893. For example, claims for visitation could arise from siblings, aunts, uncles, and other persons with special relationships. With so many potential petitioners, a court would have to decide which petitioners are more deserving of visitation than others, and how much time each petitioner should receive with the child. It could be chaotic, at best, assigning so many diverse visitations to an already limited number of weekends and hol-

idays. *Id.* at 893. *See also,* Annotation, *Visitation Rights of Persons Other Than Natural Parents or Grandparents,* 1 A.L.R.4th 1270, § 6 (1980).

■ Here, Douglas attempts to go beyond a claim for visitation and seek custody of the child. The policy constraints on granting third parties visitation also prohibit granting custody to third parties over a competing claim by the child's natural parent. If this court lacks any statutory or common law authority to authorize relationships with a third party for the purpose of ordering visitation over the natural parent's objection, we clearly have no authority to grant custody to an unrelated third party when a suitable natural parent has or seeks custody. *Cf. In re Marriage of Reschly,* 334 N.W.2d 720 (Iowa 1983) (court may only grant custody to nonparent over a parent when the parent with custody is unsuitable).

## V. *Equitable Estoppel.*

■ Douglas argues, and the trial court held, that Elizabeth should be equitably estopped from denying his paternity of Ayla. The court found Elizabeth had led Douglas to believe he was the father, Douglas believed he was the father, Elizabeth expected Douglas to act upon her representations, and he did. The court considered a number of factors to indicate the parent-child relationship including: financial support provided by Douglas, his listing of Ayla on his medical insurance policy, the inclusion of her in his will, his listing of her as his daughter and beneficiary of a life insurance policy, his claim of her as a dependent on his tax returns, his exercise of extensive and frequent visitation, the inclusion of her in family trips, his attendance at school conferences and school activities as her father, his public announcement that she was his daughter, and an acknowledgment in a written document that he was her father. The court also recognized that Ayla had treated him as her father and had referred to him as her dad.

The elements of equitable estoppel in a paternity case are identified and discussed in a separate opinion filed today. *In re Halvorsen,* 521 N.W.2d 725 (Iowa 1994). From our

de novo review of the record we do not find that Douglas has proven by clear and convincing evidence that he relied upon representations made by Elizabeth without his knowledge of the true fact that he is not Ayla's biological father. He admitted Elizabeth told him she was unsure who was the father of the child. Although Elizabeth was vague as to the child's father, Douglas did not consider it an important factor as long as he could treat Ayla as his child. He did not ask to be named as Ayla's father at the time of her birth. The 1983 blood test was taken at his request and at his expense. The report of the test results clearly and conclusively found he was not the biological father of Ayla. Douglas has failed to prove he had a lack of knowledge of the true facts of paternity.

■ Douglas attempts to rephrase the estoppel issue to get around the 1983 blood test result. He argues that Elizabeth represented to him that he would be considered the father of Ayla and it was upon this representation which he relied to his detriment. Elizabeth, however, lacks the legal authority to unilaterally make an unrelated man the father of her child. Adoption of a child may only be accomplished under the adoption statute. *In re Marriage of Holcomb*, 471 N.W.2d 76, 78 (Iowa App.1991). Not only does Elizabeth not have the authority to create an adoption without judicial proceedings, she does not have the authority to terminate the real father's rights by telling someone else that he can be the father. *See In re B.G.C.*, 496 N.W.2d 239 (Iowa 1993). To create such a relationship outside the adoption statute would also deprive Ayla of a relationship with her real father, which may not be in her best interest. *See Anthony v. Anthony*, 204 N.W.2d 829, 833 (Iowa 1973).

## VI. *Constitutional Claims.*

### A. Due Process.

■ Both parties raise due process arguments claiming that this court may not interfere with their constitutionally protected liberty interest in family integrity and privacy. It is an accepted concept that parenting is a fundamental liberty interest. *E.g., Olds*, 356 N.W.2d at 574; *Cleveland Bd. of Educ. v.*

*LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52, 60 (1974); *May v. Anderson*, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221, 1227 (1953). Elizabeth is the biological mother and custodian of Ayla and therefore clearly has a liberty interest in raising her daughter.

■ Douglas has not cited any authority which would give an unrelated third party a constitutionally protectable interest in a relationship with a child in derogation of the natural parent's liberty interest. We doubt that any sound authority for such proposition exists. Even if Douglas could establish a liberty interest in a relationship with Ayla based on psychological ties which developed while he acted as her father, that interest would not defeat the liberty interest of Ayla's natural mother. *See Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 846, 97 S.Ct. 2094, 2110–11, 53 L.Ed.2d 14, 36 (1977). In *Smith* the court observed

[i]t is one thing to say that individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have freely entered, even in the absence of biological connection or state-law recognition of the relationship. It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right. . . .

*Id.* Douglas' argument that he has a due process right to a relationship with Ayla therefore fails.

### B. Equal Protection.

Douglas claims that equal protection would be implicated by failing to apply equitable estoppel to prevent a mother from denying paternity while applying the doctrine to estop a man from disputing his paternity of a child when the elements are met. Because we find the elements of estoppel are not met in this case, we do not reach the issue of whether a parent-child status may be created by estoppel. As a result, no equal protection issue arises.

## VII. *Appellate Waiver.*

■ Douglas argues Elizabeth has waived her right to challenge the court's decision by accepting child support as ordered by the court and by proceeding with a contempt petition when support was not timely made. Under the appellate waiver doctrine, "[o]ne who accepts material and substantial benefits under a judgment or decree may not ordinarily challenge the provisions under which such benefits are awarded." *In re Marriage of Abild,* 243 N.W.2d 541, 542–43 (Iowa 1976). We have retreated from the strict application of the doctrine prevalent in earlier cases. *Johnson v. Johnson,* 301 N.W.2d 750, 752 (Iowa 1981). Here, the district court granted visitation to Douglas and required Elizabeth to comply with counseling services. The support requirements of the decree are for the benefit of Ayla, not her mother. The action of Elizabeth in attempting to enforce the court's order and to collect child support for the benefit of the child would not constitute a waiver of Elizabeth's rights of appeal.

## VIII. *Disposition.*

We reverse the district court decree that estopped Elizabeth from denying Douglas' paternity of Ayla. We remand to the district court for entry of a decree finding that Douglas is not the father of Ayla. The order providing for visitation, payment of child support, and requiring reconciliation shall be deleted.

**REVERSED AND REMANDED.**