In re the MARRIAGE OF John
J. GALLAGHER and Amy
Sue Gallagher

Upon the Petition of John J.
Gallagher, Appellant,

And Concerning Amy Sue
Gallagher, Appellee.

No. 94–1272.

Supreme Court of Iowa.

Oct. 25, 1995.

As Corrected on Denial of Rehearing
Nov. 17, 1995.

Robert L. Stuyvesant of Stuyvesant &
Benton, Carlisle, for appellant.

David Odekirk and Van T. Tran, Legal
Services Corp., Waterloo, for appellee.

HARRIS, Justice.

A few weeks before trial of this dissolution of marriage proceeding it was revealed that the husband was not the natural father of a child who is the subject of this custody dispute. In *Petition of Ash*, 507 N.W.2d 400, 403 (Iowa 1993), we rejected the equitable parent doctrine. The husband in the present case, pursuing parental rights regarding a child born during the marriage and whom he had considered his own, asks that we reconsider the rejection announced in *Ash*. In the alternative, he asks that the mother be equitably estopped from denying he is the father of the child. We conclude that *Ash* is not controlling under the circumstances here. We therefore reverse and remand.

John and Amy Gallagher were married in 1988. In 1991, while the parties were residing together as husband and wife, a child, Riley, was conceived and born. John was listed on the official birth certificate as the child's natural father. Understandably, John considered the child to be his own, and the two developed a father/daughter relationship. Sometime during 1992 John and Amy started to experience marital problems, and in 1993 John filed a dissolution of marriage petition. Before trial the district court placed joint custody of Riley in both John and Amy.

John and Amy agreed to have a home study performed for the purposes of recommending child placement. The home study concluded John would be the appropriate parent for custody of Riley. Subsequently, only three weeks prior to trial, Amy for the first time informed John he was not Riley's natural father. Blood tests confirmed this and the parties so stipulated.

On Amy's application for adjudication of law points the trial court held that John, as neither biological nor adoptive father, had no parental rights. The court also expressly rejected the theory of equitable estoppel and granted summary judgment against John. We granted John permission to bring this interlocutory appeal from that ruling. Other issues in the dissolution proceeding remain pending in district court.

■ Our review of the trial court's legal conclusions is on error. *Lihs v. Lihs*, 504 N.W.2d 890, 892 (Iowa 1993). Crucial factual issues are uncontroverted. Other unresolved controverted facts cannot form a basis for the adjudication and on review must therefore be presumed in favor of the party against whom the adjudication was entered. *See Rasmussen v. Nebraska Nat'l Life Ins. Co.*, 170 N.W.2d 370, 373 (Iowa 1969).

I. In prior cases we have rejected the equitable parent doctrine. In doing so under the facts in *Ash*, we pointed out that Ash

is a stranger to the child. He is an interested third party. He is not the child's biological father. He is not her adoptive father. He is not her stepfather. He is not her foster parent. He never married the child's mother. He is merely a man who lived with—and cared for—her mother, and who, understandably, became smitten with fatherhood after the child's birth.

507 N.W.2d at 404. We also said that no common law or statutory authority for the doctrine existed under those circumstances. We explained:

Straining to legitimize such an action under current law would foster a superfluity of claims by parties who shared a special relationship with children based neither upon affinity nor consanguinity.

*Id.* Later, in *In re Halvorsen*, 521 N.W.2d 725, 728 (Iowa 1994), we refused to apply equitable estoppel because the claimant "failed to demonstrate by clear and convincing evidence that he had a lack of knowledge of the true fact that he was not the biological father...."

The facts assumed in the adjudication here are far different. Here the biological fact of nonpaternity appeared unexpectedly in contradiction of an existing family relationship. In every way, Riley was received by both John and Amy as their daughter, and the family relationship developed accordingly. John was no stranger, or even a mere stepfather. The facts here demonstrate how different it is when a child is born into a marriage, even though (unknown to the father) it is conceived outside it.

The relationship between the husband and child in such a situation is highly likely to be much closer than those between a child and a

man whose relationship is derived only as an adjunct to that man's relationship with the child's mother. Where both the child and the husband reasonably believe they share a biological relationship, the bonding should—and can be expected to—develop to such a stage that its rupture might be devastating to both. Devastation to the child is of course the first and paramount concern because the best interest of the child is the dominating consideration in all child custody disputes. Iowa R.App.P. 14(f)(15). *See Halvorsen,* 521 N.W.2d at 729.

■ *Ash* furnished no factual basis for adoption of the equitable parent doctrine in Iowa. Applying general equitable principles, however, we believe equitable parenthood may be established in a proper case by a father who establishes all the following: (1) he was married to the mother when the child is conceived and born; (2) he reasonably believes he is the child's father; (3) he establishes a parental relationship with the child; and (4) shows that judicial recognition of the relationship is in the child's best interest.

In *Ash* we carefully contrasted the facts from those in *Atkinson v. Atkinson,* 160 Mich.App. 601, 408 N.W.2d 516 (1987). Focusing on the best interest of the child, we expressed great concern with the lack of any obligation on the part of a stepparent claimant to pay child support. *Ash,* 507 N.W.2d at 404. Of course, willingness to support the child, though an important one, is only one factor in the determination of a child's best interest. But we think it is significant that John has supported Riley from her birth and is struggling by this action to become obligated to continue doing so. Willingness to support the child, though an incomplete test of a child's best interest, is surely a crucial consideration in the determination. The point was made in *In re Paternity of D.L.H.,* 142 Wis.2d 606, 419 N.W.2d 283, 288 (App. 1987), as follows:

> Whereas in most cases estoppel will not lie because of the necessity for financial support from the biological father, we note here the availability of support from the husband and his apparent willingness to provide it. The guardian ad litem's recom-

mendation should also be considered by the trial court for this purpose.

■ II. To apply the equitable parent doctrine under these facts is entirely consistent with the principles underlying equitable estoppel. Issues of paternity, child custody, and child support are determined by a court of equity. *Metten v. Benge,* 366 N.W.2d 577, 579 (Iowa 1985); *Bruce v. Sarver,* 472 N.W.2d 631, 632 (Iowa App.1991); *see also* Iowa Code chs. 252A (child support), 598A (child custody), 600B (paternity). Courts of equity may exercise broad powers in applying equitable principles. *Sixty-Seventh Minn. State Senate v. Beens,* 406 U.S. 187, 191, 92 S.Ct. 1477, 1481, 32 L.Ed.2d 1, 7 (1972); *State ex rel. Weede v. Bechtel,* 244 Iowa 785, 818–19, 56 N.W.2d 173, 191 (1952) (stating the authority of a court to grant relief to avoid injustice is inherent in the broad discretionary power of equity); *Helton v. Crawley,* 241 Iowa 296, 311–12, 41 N.W.2d 60, 70 (1950) (stating the inherent power of a court of equity over infants is very wide). One such equitable principle is the doctrine of estoppel.

Estoppel was long available in certain situations converse to the one appearing here; more than a century ago we held that one who marries a woman known by him to be enceinte is regarded by the law as adopting the child into his family at its birth, and he becomes liable for its support as a parent, and an action against the natural father for its support will not lie. *State v. Shoemaker,* 62 Iowa 343, 344, 17 N.W. 589, 589–90 (1883). We reasoned that such a child

> is received into the family of the husband, who stands *as to it* in *loco parentis.* This being the law, [the child] enters into the marriage contract between the mother and the husband. When this relationship is established, the law raises a conclusive presumption the husband is the father of the wife's ... child.

*Id.* We need not hold that any such presumption exists today. But we do note that a number of jurisdictions have estopped the husband from denying paternity in divorce proceedings. *See* Annotation, *Liability of Mother's Husband, Not the Father of Her Illegitimate Child, For its Support,* 90

A.L.R.2d 583 (1963); 14 C.J.S. *Children Out–of–Wedlock* § 33 (1991); 10 Am.Jur.2d *Bastards* § 69 (1963). And the number of jurisdictions applying equitable estoppel in paternity situations is growing. *See* Allan Stephens, Annotation, *Parental Rights of Man Who Is Not Biological or Adoptive Father of Child but Was Husband or Cohabitant of Mother When Child Was Conceived or Born,* 84 A.L.R.4th 655 (1991); 14 C.J.S. *Children Out–of–Wedlock* § 33 (1991). We left the door open for such application in *Halvorsen,* 521 N.W.2d at 728 (elements of equitable estoppel in a paternity case not met by clear and convincing evidence).

■ Equitable estoppel is a doctrine based on fair dealing, good faith, and justice. The elements of equitable estoppel are as follows:

1. A false representation or concealment of a material fact;

2. A lack of knowledge of the true facts on the part of the actor;

3. The intention that the representation or concealment be acted upon; and

4. Reliance thereon by the party to whom it is made, to his or her prejudice and injury.

*Id.* These four elements clearly appear here. So long as it served her purposes Amy concealed from John that Riley was not his natural daughter. Indeed her every indication would lead John to think Riley was a child of their marriage. John was listed as father on the birth certificate. As late as when the home study was made in this proceeding, Amy did not hint John was not the biological father and it was because of Amy's concealment that John was unaware of the truth. Amy's intent that John act on her concealment can easily be inferred. She was afraid John would divorce her for having an affair. When dissolution proceedings were undertaken she continued her concealment in the hope of custody and support. She was prompted to reveal the truth only when the home placement study favored John as Riley's custodian. Without doubt John relied on the concealment to his detriment. He developed emotional ties with Riley and acknowledged her to the world as his daughter.

A number of reasons exist for adopting the equitable parent doctrine in dissolution cases such as this one, where paternity is an issue. These are essentially the same considerations that underlie any application of estoppel. Several other jurisdictions have followed this rationale and estopped a wife from challenging paternity in dissolution related proceedings subsequent to dissolution. *Ex parte Presse,* 554 So.2d 406, 411 (Ala.1989) (applying doctrine of collateral estoppel); *In re Marriage of O'Brien,* 13 Kan.App.2d 402, 772 P.2d 278, 283, *aff'd in part and rev'd in part on other grounds,* 245 Kan. 591, 783 P.2d 331 (1989) (wife estopped from denying paternity); *Atkinson v. Atkinson,* 160 Mich. App. 601, 408 N.W.2d 516, 519 (1987) (creating "equitable parent" doctrine); *Boyles v. Boyles,* 95 A.D.2d 95, 466 N.Y.S.2d 762, 765 (1983) (applying traditional theory of estoppel); *Nelson v. Nelson,* 10 Ohio App.3d 36, 460 N.E.2d 653, 654–55 (1983) (estopping wife from denying parentage to avoid "father-shopping" and the problem of staleness of evidence); *Hodge v. Hodge,* 84 Or.App. 62, 733 P.2d 458, 459–60 (1987) (applying equitable estoppel); *Adoption of Young,* 469 Pa. 141, 364 A.2d 1307, 1313 (1976) (invoking collateral estoppel); *In re Paternity of D.L.H.,* 142 Wis.2d 606, 419 N.W.2d 283, 286–87 (1987) (invoking equitable estoppel).

■ III. As between himself and Amy, John clearly can establish the elements of equitable parenthood. The record is however er incomplete. The case must be remanded for further proceedings in which John must show that the adjudication he seeks is in Riley's best interest. We note that any adjudication on the present record would not bind Riley or her biological father. Natural parents have fundamental rights that must be addressed. *In re B.G.C.,* 496 N.W.2d 239, 246 (Iowa 1992). The rights of natural parents of course are not unlimited and can be waived by abandonment. *In re M.M.S.,* 502 N.W.2d 4, 8–9 (Iowa 1993). Indeed we recently pointed out that:

A parent who fails to develop a relationship with his or her child while that child is establishing a family relationship with [someone else] must recognize the child thereby puts down roots that are of critical

importance. Courts must carefully deal with those roots in determining the child's best interests.

*Knell v. Schriever,* 537 N.W.2d 778, 783 (Iowa 1995).

IV. Because the parties did not raise the issue, we have not considered the effect of a recent statutory amendment. A year after our decision in *Ash,* the Iowa legislature enacted Iowa Code section 600B.41A. 1994 Iowa Acts, ch. 1171, § 48. This section states in pertinent part:

1. Paternity which is legally established may be overcome as provided in this section if subsequent blood or genetic testing indicates that the previously established father of a child is not the biological father of the child. Unless otherwise provided in this section, this section applies to the overcoming of paternity which has been established according to any of the means provided in section 252A.3, subsection 9, *by operation of law when the established father and the mother of the child are or were married to each other,* or as determined by a court of this state under any other applicable chapter.

. . . .

3. Establishment of paternity may be overcome under this section if all of the following conditions are met: . . .

. . . .

g. The court finds that it is in the best interests of the child to overcome the establishment of paternity. In determining the best interests of the child, the court shall consider all of the following:

(1) The age of the child.

(2) The length of time since the establishment of paternity.

(3) The previous relationship between the child and the established father, including but not limited to the duration and frequency of any time periods during which the child and established father resided in the same household or engaged in a parent-child relationship as defined in section 600A.2.

(4) The possibility that the child could benefit by establishing the child's actual paternity.

(5) *Additional factors which the court determines are relevant to the individual situation.*

600B.41A (1995) (emphasis added). Although this section was not argued here, it may control future cases presenting similar issues.

We thus reverse the trial court's adjudication of law points and remand the case for further proceedings in conformance with this opinion.

**REVERSED AND REMANDED.**

All justices concur except TERNUS, J., and McGIVERIN, C.J., and CARTER and LAVORATO, JJ., who dissent.

TERNUS, Justice (dissenting).

I respectfully dissent. The majority has tried to bandage a broken relationship; the result feels right, but its legal basis does not withstand close scrutiny.

As a court, we must "ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598, 610 (1986). Our decisions should "furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise." *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339, 358 (1970). Our decisions should further "fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case." *Id.* Such decisions maintain "public faith in the judiciary as a source of impersonal and reasoned judgments." *Id.*

I believe the decision announced today does not meet these expectations. The court's opinion does not advance the law in a principled fashion because it is grounded upon an emotional reaction rather than sound legal reasoning. First, the majority has overturned the rule of law we applied in our recent decision, *In re Ash,* 507 N.W.2d 400 (Iowa 1993), without providing a solid legal basis for such a reversal. Second, the majority's opinion is wrong for the same

reasons that led this court to reject equitable parenthood two years ago in *Ash*.

## I. *Ash Overturned: Equitable Parenthood Recognized.*

The majority refuses to acknowledge that *Ash* has been overruled. Instead, it states that "*Ash* furnished no *factual* basis for the adoption of the equitable parent doctrine in Iowa." (Emphasis added.) It concludes that "*Ash* is not controlling *under the circumstances here.*" (Emphasis added.) These statements ignore *Ash's* holding: We refused to adopt the equitable parent doctrine because we found "*no statutory or common law basis*" to support it, not because the *facts* precluded our application of that doctrine. *Id.* at 405 (emphasis added). Consequently, the *Ash* decision cannot be summarily dismissed with the oft-used phrase that it is "distinguishable on its facts," as implied in the majority opinion.

Lest this be seen as a mere matter of semantics, we should remind ourselves of the value of precedent. "Precedent is the device by which a sequence of cases dealing with the same problem may be called *law* rather than *will*, *rules* rather than *results.*" Frank H. Easterbrook, *Stability & Reliability in Judicial Decisions,* 73 Cornell L.Rev. 422, 422 (1988) (emphasis added). The doctrine of stare decisis

> enhances the efficiency of judicial decision making, allowing judges to rely on settled law without having to reconsider the wisdom of prior decisions in every case they confront, and because it fosters predictability in the law, permitting litigants and potential litigants to act in the knowledge that precedent will not be overturned lightly and ensuring that they will not be treated unfairly as a result of frequent or unanticipated changes in the law.

*Teague v. Lane,* 489 U.S. 288, 332, 109 S.Ct. 1060, 1087, 103 L.Ed.2d 334, 370 (1989) (Brennan, J., dissenting); *accord Hubbard v. United States,* — U.S. —, —, 115 S.Ct. 1754, 1763, 131 L.Ed.2d 779, 792 (1995) ("*Stare decisis* is 'a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurispruden-

tial system that is not based upon an arbitrary discretion.'") (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 172, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132, 147 (1989)). Thus, adherence to precedent has value. *Kersten Co. v. Department of Social Servs.,* 207 N.W.2d 117, 121 (Iowa 1973) ("Stare decisis is a valuable legal doctrine which lends stability to the law....."). Consequently, we should not lightly disregard the rule of law embodied in our *Ash* decision.

To ensure that we are persuaded by reason and not result, we must be able to intelligently and specifically explain why precedent should be ignored: "Covert tools are never reliable tools." Karl N. Llewellyn, *The Common Law Tradition: Deciding Appeals* 365 (1960). The majority must demonstrate a *reason* to overturn *Ash:* related principles of law have developed so far as to have left *Ash* a doctrinal anachronism; *Ash's* rule has been found unworkable; or our decision was clearly erroneous. The majority fails to do so for good reason: There have been no developments in social values or the law in the two years since *Ash* was decided which can justify a different result here.

The real explanation for the rejection of *Ash* here is that the majority finds the conduct of Amy reprehensible; rewarding her deceit at John's expense is an unacceptable result. The majority has been swayed by the *result* in this case and has forgotten the *reason* that led us to reject equitable parenthood in *Ash.* When we say

> '[t]his is the basis of our decision,' [we] not only constrain lower courts, [we] constrain [ourselves] as well. If the next case should have such different facts that [our] political or policy preferences regarding the outcome are quite opposite, [we] will be unable to indulge those preferences; [we] have committed [ourselves] to the governing principle.

Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U.Chi.L.Rev. 1175, 1179 (1989). The majority has conveniently dismissed the fact that we committed ourselves to a principle in *Ash.* Overruling precedent based upon the majority's motivation is exactly what the stare decisis doctrine is meant to prevent.

II. *Overruling Precedent: Legitimate and Illegitimate Techniques.*

A. *Ash was a **policy** determination—not a fact-based decision.* In the absence of any explanation of why equitable parenthood was inappropriate two years ago but is appropriate now, I must conclude that the majority has decided that *Ash* was wrongly decided in 1993. If our decision in *Ash* is "clearly erroneous," we have a duty to overrule it. *Kersten Co.*, 207 N.W.2d at 121 (stare decisis "should not be invoked to maintain a clearly erroneous result"); *Doolittle v. Shelton*, 1 Greene 272, 273 (Iowa 1848) (we will not disturb a prior decision "unless clearly erroneous"). However, we also have an obligation "to make clear our reasons for" doing so. *Stuart v. Pilgrim*, 247 Iowa 709, 714, 74 N.W.2d 212, 216 (1956). The majority has failed to elucidate its reasons for concluding that *Ash* was "clearly erroneous."

The majority merely notes that "[t]he facts assumed in the adjudication here are far different" from those in *Ash*. But as previously noted, *Ash* rejected the equitable parent doctrine, not for lack of factual support, but for policy reasons: There was no "statutory or common law basis" for the doctrine. *See Ash*, 507 N.W.2d at 404–05 ("The same constraints and policy reasons cited earlier in *Olds* and *Lihs* apply with equal force to questions of paternity."; "We find no statutory or common law basis for James' claim of paternity."). Our earlier rejection of equitable parenthood on a doctrinal basis is further evidenced by the varying factual patterns of the cases we cited in support of our holding—including cases with married couples. *Id.* (citing *In re Marriage of O'Brien*, 13 Kan.App.2d 402, 772 P.2d 278, 283–84 (1989) (rejecting equitable parent claim by mother's former husband); *Lipiano v. Lipiano*, 89 Md.App. 571, 598 A.2d 854, 857 (1991) (refusing to apply doctrine to husband who was not biological father of child born during marriage); *Zuziak v. Zuziak*, 169 Mich.App. 741, 426 N.W.2d 761, 766 (1988) (declining to extend *Atkinson* to custody dispute between mother and stepmother); *In re Z.J.H.*, 162 Wis.2d 1002, 471 N.W.2d 202, 209 (1991) (rejecting claim by adoptive parent's former partner)).

"The doctrine of *stare decisis* renders the ruling of *law* in a case binding in future cases before the same court." *Gately v. Commonwealth*, 2 F.3d 1221, 1226 (1st Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994). The fact that the issue presented in *Ash* might be considered difficult or close is not an adequate reason to disregard our decision in that case. *Goodman v. Henry L. Doherty & Co.*, 218 Iowa 529, 530–31, 255 N.W. 667, 668 (1934).

B. *Equity without a legal basis cannot overturn Ash.* The majority makes no effort to address the policy concerns raised in *Ash* but instead relies on the court's general equitable power. However, even our equitable powers should be exercised in a principled fashion, consistent with precedent; equity is not an opportunity to do whatever we think is right regardless of the law. The majority has failed to heed Blackstone's warning:

> And law, without equity, tho' hard and disagreeable, is much more desirable for the public good, than equity without law; which would make every judge a legislator....

William Blackstone, 1 *Commentaries on the Laws of England* 62 (U.Chi.Press 1979). A reexamination of our decision in *Ash* and the reasons underlying that decision demonstrate that *Ash* was correctly decided and should remain binding precedent.

III. *Policy Demands a Rejection of Equitable Fatherhood.*

The majority states, "A number of reasons exist for adopting the equitable parent doctrine.... These [reasons] are essentially the same considerations that underlie any application of estoppel." The majority fails to reveal what these "reasons" or "considerations" are. Moreover, to imply that this case involves the "*same* considerations that underlie *any* application of estoppel" is to reveal a profoundly superficial understanding of the legal and social implications of the court's decision. *This case is not a routine estoppel case.*

A. *Equitable fatherhood is inconsistent with visitation principles.* In *Ash*, the court refused to bestow parental rights upon a person who was not an adoptive or biological

parent. *Ash*, 507 N.W.2d at 405. We pointed out that unlike some states, a stepparent in Iowa cannot be treated as a natural parent against the stepparent's will and cannot be forced to pay child support. *Id.* at 404. We concluded that "[t]he logical extension of our case law is that a stepparent is not treated as a natural parent and is, therefore, not entitled to visitation." *Id.*

We relied on our cases and statutes defining visitation rights of third persons to identify the policy considerations militating against recognition of equitable parenthood. Our decision in *Ash* " 'demonstrates a respect for family privacy and parental autonomy.' " *Id.* at 403 (quoting *Olds v. Olds*, 356 N.W.2d 571, 574 (Iowa 1984)). " 'It also recognizes that the parenting right is a fundamental liberty interest that is protected against unwarranted state intrusion.' " *Id.* The judicial creation of a parent " 'would divide and thereby hamper proper parental authority, force the child into the midst of a conflict of authority and ill feelings' between the parents and other persons, and 'coerce what should remain a moral rather than legal obligation.' " *Id.* at 403 (quoting *Olds*, 356 N.W.2d at 573).

We concluded that the recognition of equitable parenthood status would be inconsistent with our visitation cases and the policies underlying those cases:

> Nevertheless, James [the third party] has no legal basis for asserting parental status. This conclusion is consistent with our recent holdings in the three visitation cases cited earlier, *Lihs*, *Freel*, and *Olds*. In those cases, several third parties outside the realm of legitimate claimants sought visitation with children with whom they had some special relationship. And, while we sympathized with their plight, we consistently refused to grant visitation. The reason was simple: absent any statutory or common law authority authorizing such relationships, our courts lack the power to order visitation in such circumstances.

*Id.* at 404. This reasoning holds true today. If our court lacks the power to order *visitation* in circumstances outside the statute, where have we found the power to decree *parental status* in circumstances outside our statutes governing that status? A review of Iowa statutes and case law in the area of parental rights illustrates that we do not have that power.

B. *Equitable fatherhood is inconsistent with custody principles.* We should consider the relationship between the doctrine adopted by the majority and our long-standing rule that a biological parent has a right to custody over third parties unless the biological parent is unsuitable. *See In re Marriage of Halvorsen*, 521 N.W.2d 725 (Iowa 1994). We said in *Halvorsen* that "[a] court may only grant a nonparent custody of a child over a parent when the nonparent proves that the parent seeking custody is not suitable to have custody." *Id.* at 729. By virtue of our decision today, however, we have set the stage for an entirely suitable "real" parent to lose custody if the elements of equitable parenthood are met. The court-created fiction that John is now a "parent" does not alter the fact that our traditional rule giving priority to the biological or adoptive parent is severely undermined.

C. *Equitable fatherhood is inconsistent with adoption principles.* It is also important to remember that we do not recognize equitable adoption. The majority relies on the Michigan case of *Atkinson v. Atkinson*, 160 Mich.App. 601, 408 N.W.2d 516 (1987), wherein the Michigan court of appeals adopted the theory of equitable parenthood. In doing so the Michigan court recognized that the legal relationship created by the theory of equitable parenthood is "akin" to the doctrine of equitable adoption, recognized in Michigan. *Atkinson*, 408 N.W.2d at 520.

In contrast, adoptions in Iowa are exclusively creatures of statute. *In re B.G.C.*, 496 N.W.2d 239, 241 (Iowa 1993). Indeed, we have required strict adherence to our adoption laws. *E.g.*, *id.* at 243; *Sampson v. Holton*, 185 N.W.2d 216, 219 (Iowa 1971) (holding that the failure of the parties to follow the adoption provisions in any material respect deprives the court of the power to decree an adoption). Nevertheless, we are establishing parenthood in this case without any of the protections inherent in the adoption statutes.

We should recall the principles of law set forth in our earlier adoption cases:

> We cannot cut across the statutes. The rules have been laid down by the legislature, and we must give them effect....
>
> ....
>
> Courts cannot decide cases like this one on the basis of grief....
>
> The statutes regulating the transfer of permanent rights and responsibilities with respect to children constitute an enlightened effort by the legislature to protect the interests of the child, the natural parents, and the adopters.

*Sampson,* 185 N.W.2d at 219. In *In re B.G.C.,* we cautioned against letting the facts of a particular case lead us to unprincipled decisions:

> As tempting as it is to resolve this highly emotional issue with one's heart, we do not have the unbridled discretion of a Solomon. Ours is a system of law, and adoptions are solely creatures of statute. As the district court noted, without established procedures to guide courts in such matters, they would "be engaged in uncontrolled social engineering."

*In re B.G.C.,* 496 N.W.2d at 241. The majority ignores these words of advice and makes John a father in direct contravention of the requirements set forth by the legislature.

D. *Equitable fatherhood is inconsistent with termination principles.* Our court has also required strict adherence to the procedures dictated by the legislature for termination of parental rights. *Id.* at 245; Iowa Code § 600A.3 (1995) ("Termination of parental rights shall be accomplished only according to the provisions of this chapter."). Clearly, the result of the pending dissolution case will not be effective to terminate the natural father's parental rights. Nevertheless, bestowing parental rights on John will have a profound impact on the natural father's rights. This impact is tantamount to a partial termination of rights insofar as the natural father will have to share his parental rights. Although the majority emphasizes that any adjudication in the present case does not bind the natural father, such a conclusion is unreasonable. To the extent John is given parental rights, they must be taken from the natural father. I do not think we have the power to do this in the face of the detailed and historical regulation of parent-child relationships by the legislature.

IV. *Ramifications of Adopting Equitable Fatherhood.*

Even if our statutes regulating child visitation, adoption and termination of parental rights are not seen as a barrier to our recognition of equitable parenthood, we should be very slow to venture into an area that is so fraught with unsolvable problems. The majority conveniently remands the case to the trial court "for further proceedings in conformance with this opinion." It fails to consider the complex consequences of its decision.

Perhaps we should take a moment to think about the task facing the trial court. If the biological father appears, will his assertion of custody or visitation rights prevent the assertion of similar rights by John? If not, do John *and* the biological father have the parental rights of a father? Are the expectations of a third party or the actions of the child's mother a constitutionally-sufficient basis to require the biological father to share his precious parental rights with another man?[1] If the biological father is reasonably

---

**1.** The United States Supreme Court has recognized that an unwed biological father who has developed a relationship with his child acquires a constitutionally protected interest. *Lehr v. Robertson,* 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (1983); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Moreover, courts have recognized that biological parenthood offers a father a constitutionally protected "opportunity interest" to develop a relationship with his offspring. *See Lehr,* 463 U.S. at 262, 103 S.Ct. at 2993, 77 L.Ed.2d at 627; *In re Adoption of Kelsey S.,* 1 Cal.4th 816, 4 Cal. Rptr.2d 615, 627, 823 P.2d 1216, 1228 (1992) (en banc); *Petition of Kirchner,* 164 Ill.2d 468, 208 Ill.Dec. 268, 277, 649 N.E.2d 324, 333, *cert. denied,* —— U.S. ——, 115 S.Ct. 2599, 132 L.Ed.2d 846 *cert. denied,* —— U.S. ——, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995); *In re Adoption of B.G.S.,* 556 So.2d 545 (La.1990); *R.B. v. C.S.,* 536 N.W.2d 634, 637 (Minn.Ct.App.1995); *In re J.W.T.,* 872 S.W.2d 189, 195 (Tex.1994). We

unaware of the present proceedings, may he later overturn a finding of equitable parenthood in order to preserve his rights as a father for himself alone? Are the rights of the biological father superior to those of the equitable father, or do the superior rights belong to the "father" most bonded to the child? If the "father" with the strongest emotional ties to the child has the superior rights, does he lose those rights if the child's emotional ties to the other "father" become predominant? With whom does the child spend father's day? As one court has commented in considering whether to bestow parental rights on a person who is neither the biological nor adoptive parent, "It would be virtually impossible to ensure *equity* to all parties and protect the best interests of the child under such a scenario." *In re Z.J.H.*, 162 Wis.2d 1002, 471 N.W.2d 202, 209 (1991) (emphasis added).

The collateral problems that the courts will be asked to resolve are nearly endless. Can the child inherit from both fathers? If the child dies, do the two fathers share the inheritance to which the biological father would normally be entitled? Can a child bring a wrongful death claim for her equitable father's death? Does the tortfeasor negligently causing the death of a child owe loss of consortium damages to both natural parents and the equitable father? Iowa Code chapter 232 governs juvenile delinquency, termination of parental rights and child-in-need-of-assistance proceedings. It defines a "parent" as "a biological or adoptive mother or father of a child." Iowa Code § 232.2(39) (1995). Will John as an equitable parent have any rights or responsibilities under this statute? Will all parents—biological, adoptive and equitable—have the same rights and responsibilities, or are we establishing degrees of parenthood?

## V. *Equitable Fatherhood Adopted: Result Over Reason.*

What the majority does today is a profound departure from the philosophy of our prior cases and the statutes enacted by the Iowa legislature. Both the judicial branch and the legislative branch have placed paramount importance on the relationship between the biological or adoptive parents and the child. Today we run roughshod over that relationship because we are offended by the biological mother's conduct and sympathize with the third party's emotional plight. *Given the complex practical, social and constitutional ramifications of the equitable parent doctrine, we should have a much more solid basis upon which to rest our decision than our general sense that equity requires this result.*

In *Olds v. Olds,* 356 N.W.2d 571 (Iowa 1984), we observed that "the government is ill-equipped to dictate the details of social interaction among family members." *Olds,* 356 N.W.2d at 574. We are equally ill-equipped to dictate the details of social interaction between the unrelated persons before us today. Amy knows, John knows, Riley undoubtedly knows, and we know that John is not Riley's father. Nothing we say or do will change this biological fact. The sooner the courts acknowledge this fact as determi-

referred to such an opportunity interest in *In re B.G.C.:* "[A] finding of abandonment under these circumstances would deprive a father of a meaningful right, protected by the Constitution, to develop a parent-child relationship." *In re B.G.C.,* 496 N.W.2d at 241 n. 1.

"This opportunity interest begins at conception and endures probably throughout the minority of the child." *In re Baby Girl Eason,* 257 Ga. 292, 358 S.E.2d 459, 462 (1987). "Absent abandonment of his interest, a state may not deny a biological father a reasonable opportunity to establish a relationship with his child." *Id.* If the mother thwarts an unwed father's ability to cultivate his opportunity interest, the father has a lesser burden to show that he has not abandoned his interest. *See Kirchner,* 208 Ill.Dec. at 277,

649 N.E.2d at 333 (unwed fathers prevented from grasping opportunity through deception are entitled to same protections as fathers who are given the opportunity and do develop a relationship: "To hold otherwise would be to encourage and reward deceit."); *Nale v. Robertson,* 871 S.W.2d 674, 680 (Tenn.1994) (despite mother giving child up for adoption father made reasonable effort to establish relationship, thus establishing "a fundamental liberty interest in the child"); *accord Abernathy v. Baby Boy,* 437 S.E.2d 25, 29 (S.C.1993).

Here the record is silent as to the biological father's actions toward his child. Establishing an equitable father without this knowledge may violate the biological father's constitutional rights.

native of the parties' legal status, the sooner all concerned can get on with their lives.

I would affirm the ruling of the district court that John Gallagher, who is neither the biological father nor the adoptive father of Riley, has no parental rights to the child.

McGIVERIN, C.J., and CARTER and LAVORATO, JJ., join this dissent.