# IN THE COURT OF APPEALS OF IOWA

No. 15-0177
Filed December 9, 2015

IN RE THE MARRIAGE OF JOSEPH VINCENT COLARUSSO
AND KARYL JEAN COLARUSSO

Upon the Petition of
**JOSEPH VINCENT COLARUSSO,**
        Petitioner-Appellee,

And Concerning
**KARYL JEAN COLARUSSO, n/k/a KARYL JEAN HUGHES,**
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Marlita A. Greve,

Judge.

Karyl Hughes appeals the district court's ruling denying her motion to

amend the 1999 Qualified Domestic Relations Order to reflect the intent of the

court's division of their marital property in their 1990 dissolution of marriage

decree. **AFFIRMED.**

Elliott R. McDonald III and Ryan F. Gerdes of McDonald, Woodward

& Carlson, P.C., Davenport, for appellant.

Christine Frederick of Zamora, Taylor, Woods & Frederick, Davenport,

and Gary D. McKenrick of Cartee & McKenrick, P.C., Davenport, for appellee.

Considered by Doyle, P.J., and Mullins and Bower, JJ.

**DOYLE, Presiding Judge.**

In contention here is whether a Qualified Domestic Relations Order (QDRO), entered some nine years after Joseph and Karyl Colarusso's 1990 decree of dissolution of marriage, correctly reflects the intent of the decree's division and disposition of Joseph's retirement benefits. The decree provides that when and if Joseph begins to receive his government pension benefits, Karyl is to be paid forty percent of a fraction of the benefits. The QDRO fixes the value of Karyl's forty percent by the amount of accrued benefits as of the date of the dissolution, January 30, 1990.

Joseph retired in September 2011, and his pension went into "pay status." The parties then began collecting benefits pursuant to the QDRO's provisions.[1]

In 2014, Karyl moved to amend the QDRO, contending the QDRO was in error because the decree provided that the value of her share of the pension was to be determined as of the date of Joseph's retirement, not the date of dissolution. The district court denied Karyl's motion concluding "the pension's value was meant to be determined at the time of the dissolution, not more than [twenty] years later." Karyl appeals the court's ruling. Ultimately, we affirm.

### I. Background Facts and Proceedings.

Joseph and Karyl were married on May 31, 1970. They divorced some twenty years later on January 30, 1990. Joseph worked for the Department of the Army for nineteen of the parties' twenty-year marriage. His pension benefits

---

[1] The record before us does not reflect the amount of the monthly benefits now being paid to the parties, nor does it reflect the basis upon which Karyl's payments are calculated.

at the time of the dissolution of marriage were valued at $37,340—representing his contributions. Karyl also had a pension, apparently valued at $6660.

In its decree, the dissolution court found:

Both pensions are assets earned during the marriage, and should be considered in any property distribution. No evidence concerning present value has been presented. Total pension value is $44,000 which is valuable to each party at the time pension benefits are paid, and to which they should share equally based upon their contribution during the period of the marriage and the total number of years contribution to the respective funds.

In its division of the parties' property, the dissolution court ordered the following with regards to the parties' pensions:

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that [Karyl] be awarded all right, title and interest in and to her pension plan and benefits, free and clear of any claim of [Joseph]. [Joseph] shall be awarded all right, title and interest in and to his pension plan and fund, except that when and if [Joseph] commences to receive his government pension, he shall pay to [Karyl] an amount equal to 40% of a fraction of his pension; the numerator[2] of the fraction being 19, the number of years of marriage during which [Joseph] worked for the government, and the denominator[3] of the fraction being the total number of years during which the pension benefits were accumulated prior to being paid.

The decree made no provision for the entry of a QDRO.

In July 1999, Karyl filed a motion for entry of a domestic relations order. The motion indicates a copy of the proposed QDRO was attached, but that attachment is not a part of the record before us. Joseph resisted the motion. Apparently the parties took the matter up before a district court judge, for in a second motion for entry of a QDRO, Karyl represented that the parties had

---

[2] The numerator is "the part of a fraction that is above the line and signifies the number of parts of the denominator taken." Webster's Seventh New Collegiate Dictionary 578 (1967).
[3] The denominator is "the part of a fraction that is below the line signifying division." Webster's Seventh New Collegiate Dictionary 221 (1967).

previously appeared before a district court judge, "who indicated that a [QDRO] should be entered to effectuate and enforce the Decree." The motion also states that "immediately following the hearing" Karyl's attorney mailed a QDRO to Joseph's attorney. The motion further states that "since mailing said Order," Karyl's attorney mailed to Joseph's attorney a letter asking for the QDRO to be returned, "however it has not been returned." Karyl asked that the court enter the QDRO "without approval of counsel." Six days later, on September 28, 1999, the district court entered the "Domestic Relations Order" prepared by Karyl's attorney. Although the order had a provision for each party's counsel to sign "approved as to form," neither attorney signed.

At issue in this appeal is the following QDRO provision:

Alternate Payee [Karyl] is entitled to a portion of Participant's [Joseph's] gross annuity as set forth in the formula below:

| 40% | of the accrued pension benefit to the credit of the Participant [Joseph] as of January 30, 1990 |
|---|---|
| X | Number of months of marriage during which benefits were being accumulated |
| OVER | Total months during which benefits were accumulated |
| **EQUALS** | **Actual Payments of Distribution to Alternate Payee [Karyl]** |

Karyl's motion for entry of an amended QDRO asked the court to correct an error in this provision of the QDRO. She asserted that the QDRO violated the language of the decree because the QDRO provides for valuation of her share of the pension to be fixed as of the date of dissolution and not the date of Joseph's retirement when he started receiving benefits. Joseph resisted, arguing, among

other things, the QDRO complied with the decree's language. A hearing was held but not reported because of court reporter unavailability.

"Considering the case law at the time of [the] decree, 1990, and the equitable effect of [Karyl's] request," the district court found the "decree clearly intended [Karyl] to receive a portion of the value of the pension at the date of the entry of the decree." As to the equity piece of the ruling, the court stated:

> It is only fair to divide the value of the pension at the time of the divorce. This proposition is supported by the equities in this case: (1) this dissolution was granted almost [twenty-five] years ago; (2) in 1999, the QDRO was entered; (3) [Joseph] began collecting his retirement benefits since March of 2012; (4) [Karyl] has been receiving her share of [Joseph's] benefits since March of 2012; [Joseph's] retirement plan was based on [Karyl] receiving a share of his pension plan as of the date of the decree.

It was the court's "inescapable conclusion [that] the pension's value was meant to be determined at the time of the dissolution, not more than [twenty] years later." Karyl's motion was denied. When asked to clarify its ruling, the court stated: "The court's ruling finds that the [QDRO], which was entered in 1999, accurately reflected the intentions of the court at the time of the entry of the decree, which was 1990." The court declined to amend or enlarge its original ruling any further.

Karyl now appeals.

## II. Discussion.

### A. Jurisdiction.

Before we can examine the merits of Karyl's appeal, we must address Joseph's jurisdictional argument, for he maintains the court lacked jurisdiction to amend the QDRO. He asserts the QDRO is a final judgment and "all time limits

and opportunities to challenge the QDRO have long expired." He claims Karyl's motion to amend the QDRO was untimely because she did not file an appropriate post-trial motion pursuant to Iowa Rule of Civil Procedure 1.904(2), nor appeal the QDRO pursuant to Iowa Rule of Appellate Procedure 6.101(1)(b), nor file a petition to vacate or modify judgment pursuant to Iowa Rule of Civil Procedure 1.1013. If Karyl was requesting a modification of the property division, we would agree because a property division generally is not modifiable. *See In re Marriage of Morris*, 810 N.W.2d 880, 886 (Iowa 2012); *see also* Iowa Code § 598.21(7) (2013). But the import of Karyl's request is not for modification of the property division. She is asking that the QDRO be modified to conform to the property division as provided in the decree.

Normally, a property disposition that includes the division of retirement benefits proceeds in two steps. First, a dissolution of marriage decree, a substantive order which equitably divides and assigns the parties' property, is entered. *See In re Marriage of Brown*, 776 N.W.2d 644, 647-48 (Iowa 2009) (discussing finality of decrees, property division, and QDROs); *see also Breslin v. Synnott,* 54 A.3d 525, 527 (Vt. 2012) (citing 2 B. Turner, *Equitable Division of Property* § 6:20, at 113 (3d ed. 2005)). Second, in order for the division of retirement benefits to be implemented, a QDRO is entered as a court order directing the plan administrator to make certain specified payments to the ex-spouse.[4] *See id.*

---

[4] "Because of certain anti-alienation restrictions in the Employee Retirement Income Security Act (ERISA) and the federal tax code, a QDRO must be filed for every pension division undertaken pursuant to a divorce." *Brown*, 776 N.W.2d at 647-48 (citing *Rohrbeck v. Rohrbeck*, 566 A.2d 767, 768-71 (Md. 1989)). "ERISA does not

A QDRO is defined in relevant part by [ERISA] as a domestic relations order "which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I). In order for the QDRO to be qualified—for the Q to be added to the DRO—certain requirements must be met. See *id.* § 1056(d)(3)(C)-(D). Once the plan administrator qualifies the QDRO, payments are made in accordance with the requirements contained in the QDRO. *Id.* § 1056(d)(3)(A). It is from this statutory scheme and general description of QDRO practice that we draw the conclusion that a QDRO is characterized properly as a procedural device that enforces an underlying substantive order. *See Kremenitzer v. Kremenitzer,* [838 A.2d 1026, 1028 (Conn. Ct. App. 2004)] (explaining that a QDRO is vehicle for enforcing court judgment); see also Turner, § 6:20, at 113-14 (noting "strong general rule" that QDRO is not substantive order, but rather "*procedural device[ ] for enforcing the terms of the underlying substantive order*").

*Breslin*, 54 A.3d at 527-28. We too draw the conclusion that a QDRO is characterized properly as a procedural device entered to effectuate the property division made in the underlying substantive dissolution decree, and for that reason, we conclude the QDRO is not a "final judgment" subject to the variety of deadlines imposed to challenge a final judgment. *See also In re Marriage of Veit*, 797 N.W.2d 562, 564 (Iowa 2011) ("[T]he QDRO is not itself a property settlement, but is merely a method of effectuating the property division contained in a dissolution decree and may be modified later without affecting the finality of the underlying decree.").

Joseph also claims the very language of the QDRO divests the court of jurisdiction to amend the QDRO. The QDRO provides: "Jurisdiction is retained by this court until all benefits awarded have been accepted by the Associate

---

require a QDRO to be a part of the actual judgment in a case." *In re Marriage of Bruns*, 535 N.W.2d 157, 162 (Iowa Ct. App. 1995) (citing *Baird v. Baird*, 843 S.W.2d 388, 392 (Mo. Ct. App. 1992), and *Rohrbeck*, 566 A.2d at 771).

Director according to this order." The QDRO was accepted by the Office of Personnel Management, so, according to Joseph, it follows that the court no longer has jurisdiction to modify the QDRO. That cannot be. A QDRO is a procedural device for enforcing the terms of the underlying decree. If the QDRO's provisions contravene the provisions of the underlying decree, the court must necessarily retain jurisdiction to correct the error so that its decree may be properly enforced. A district court retains authority to interpret and enforce its prior decree. *See Morris*, 810 N.W.2d at 886. We are therefore not persuaded by Joseph's argument that the court lacks jurisdiction to modify the QDRO, and we move on to the merits of the appeal.

### B. QDRO.

Our review of an equitable action is de novo. *See* Iowa R. App. P. 6.907. "We review the construction of a dissolution decree as a matter of law." *In re Marriage of Goodman*, 690 N.W.2d 279, 282 (Iowa 2004); *but see Veit*, 797 N.W.2d at 564 (applying de novo review in determining whether QDRO fulfilled terms of dissolution decree); *Brown*, 776 N.W.2d at 647 (reviewing de novo whether district court properly interpreted dissolution decree); *In re Marriage of Pals*, 714 N.W.2d 644, 646 (Iowa 2006) (reviewing de novo the court's ruling in an equitable "proceeding to modify or implement a marriage dissolution decree subsequent to its entry"). The parties agree our review is de novo.

On appeal Karyl argues the district court erred in concluding the QDRO accurately reflected the intent of the dissolution decree. "A dissolution decree is construed like any other written instrument." *Brown*, 776 N.W.2d at 650.

"The decree should be construed in accordance with its evident intention. Indeed the determinative factor is the intention of the court as gathered from all parts of the decree. Effect is to be given to that which is clearly implied as well as to that which is expressed. Of course, in determining this intent, we take the decree by its four corners and try to ascertain from it the intent as disclosed by the various provisions of the decree."

*Goodman*, 690 N.W.2d at 283 (quoting *In re Estate of Roberts*, 131 N.W.2d 458, 461 (Iowa 1964)). "In construing a dissolution decree, we give force and effect to every word, if possible, in order to give the decree a consistent, effective and reasonable meaning in its entirety." *Brown*, 776 N.W.2d at 650. But, when a document is unambiguous, intent is determined by the words of the document itself. *See Hofmeyer v. Iowa Dist. Ct.*, 640 N.W.2d 225, 228 (Iowa 2001).

The decree's language in question here is

when and if [Joseph] commences to receive his government pension, he shall pay to [Karyl] an amount equal to 40% of a fraction of his pension; the numerator of the fraction being 19, the number of years of marriage during which [Joseph] worked for the government, and the denominator of the fraction being the total number of years during which the pension benefits were accumulated prior to being paid.

The unresolved question is the time at which we are to set the "value" of the benefit for purposes of calculating the equation. Is it the vested value accrued at the time of dissolution (i.e., the amount Joseph would be entitled to receive if he were to retire immediately and begin drawing benefits), or the value accrued at maturity (i.e., the amount Joseph actually received when he began to draw benefits at retirement)? The decree is silent.

In support of his position that the value of Karyl's pension benefit is to be fixed at the time of dissolution, Joseph argues the decree's language must be interpreted in light of the case law extant in 1990, the year the decree was

entered, not as the law exists today. In support of her position that the value of her pension benefit is to be determined at the time of maturity (retirement), Karyl relies on *In re Marriage of Benson*, 545 N.W.2d 252 (Iowa 1996), but she also argues the case law in existence at the time the decree was entered also supports her position.

Pension plans are divisible marital property. *In re Marriage of Mott*, 444 N.W.2d 507, 510 (Iowa Ct. App. 1989). Before retiring, Joseph worked in a civil service position for the United States Army and participated in the Civil Service Retirement System (CSRS). This is a "defined benefit" plan, under which an employee is entitled to a specified monthly benefit based on years of service and pay. *See In re Marriage of Kiser*, 32 P.3d. 244, 245 (Or. Ct. App. 2001); *see also Pulliam v. Pulliam,* 796 P.2d 623, 624 (Okla. 1990). One scheme for dividing pension benefits is to award the spouse a portion of the pension benefits if and when they accrue. *Mott*, 444 N.W.2d at 511. This is called the "percentage method."[5] *Benson*, 545 N.W.2d at 255. This was the method employed here.

Joseph contends the case law "in 1990 clearly provided for the division of the value of pensions at the time of the dissolution of marriage, not at the time of retirement."[6] The law was not as "clear" as Joseph asserts. As the *Benson* court

---

[5] The other method is called the "present-value" method which determines the present value of benefits and allocates a share to the pensioner's spouse. *See Benson*, 545 N.W.2d at 255. This method is advantageous for the immediate distribution of a lump sum payment. *See id.* For examples of present-value method cases, see *In re Marriage of Bevers*, 326 N.W.2d 896, 900 (Iowa 1982); *In re Marriage of Wheeler*, 418 N.W.2d 362, 363 (Iowa Ct. App. 1987); and *In re Marriage of Voss*, 396 N.W.2d 801, 803 (Iowa Ct. App. 1986).

[6] Joseph also asserts "[t]he decretal court relied on *Bevers* and *Mott*, which evidences its intention to use the formula set forth therein to value the pension as of the date of the decree." However, the decretal court cited *Bevers* and *Mott* only for the proposition that "[p]ension funds accumulated during the marriage are marital property,

recognized, a series of court of appeal cases from 1989 to 1991 reached inconsistent results in applying the percentage method to dividing pensions. *Id.* at 256 (citing *Mott*, 444 N.W.2d at 511; *In re Marriage of Curfman*, 446 N.W.2d 88, 90 (Iowa Ct. App. 1989); and *In re Marriage of Oler*, 451 N.W.2d 9, 12 (Iowa Ct. App. 1989)). Our own review of pre-decree pension division cases finds the waters murky, if not downright muddy.

Of the pre-decree percentage-method pension cases reviewed, we discern two lines of analysis. The first line of cases involves pension division when the monthly benefit is known at the time of trial, i.e., the monthly benefit is already being paid or a projected monthly benefit is calculated based upon accrued benefits at the time of entry of the decree. In those cases, the court first establishes the marital property portion of the pension by multiplying the monthly benefit (either currently being paid or accrued benefit as of the dissolution), by the martial portion fraction. *See In re Marriage of Howell*, 434 N.W.2d 629, 633 (Iowa 1989); *Mott*, 444 N.W.2d at 511; *In re Marriage of Williams*, 449 N.W.2d 878, 882 (Iowa Ct. App. 1989); *Oler*, 451 N.W.2d at 12 (husband's pension). The resulting amount is the amount of marital pension to be divided. This figure is then multiplied by the percentage of the marital pension awarded to the pensioner's spouse. *See id.* The resulting amount is a fixed monthly amount the spouse is to be paid when the monthly pension benefits are paid to the pensioner. *See id.* As a practical matter, under this scheme, the numerator *and* the denominator are fixed as of the date of the decree because the amount paid

---

may be considered as such, and should be addressed in any property distribution." The parties do not dispute this proposition.

to the spouse is fixed at the time of decree. *See id.* Here, unlike the courts in *Howell*, *Mott*, *Williams*, and *Oler*, the decretal court was hobbled by the fact that the parties did not provide it with the present value of Joseph's plan or the amount of Joseph's accrued benefit at the time of dissolution. So, we find *Howell*, *Mott*, *Williams*, and *Oler* are not dispositive in this case.

We turn to the other line of cases, much like the one before us. These cases involve pension divisions where the accrued benefits are unknown at the time of trial. In *In re Marriage of Woodward*, this court approved a decree that provided for division of a defined benefit plan as follows:

> when [the pensioner] draws his pension, then [he] shall pay to [spouse] an amount equal to one-half of a fraction of the pension, the numerator of the fraction being fourteen (the years of marriage during which the benefits were accumulated) and the denominator being the total number of years during which benefits were accumulated prior to when paid.

426 N.W.2d 668, 670-71 (Iowa Ct. App. 1988). The language is nearly identical to the Colarusso decree.

In *Curfman*, another defined benefit plan was at issue. *See* 446 N.W.2d at 89. The district court in that case found the pension plan had no current value and gave the entire plan to [the pensioner]. *See id.* [The spouse] claimed this was inequitable, and this court agreed. *See id.* Even though payment of benefits was contingent upon [the pensioner's] survival, we found the plan had value, with the "present interest . . . derived from the amount of monthly benefits promised at retirement rather than a present interest." *Id.* We noted;

> Where it is difficult to place a present value on pension or profit sharing due to uncertainties regarding vesting or maturity, each spouse may be awarded an appropriate percent to be paid if and when pension is payable, apportioning benefits only if and when

paid. This allocates equally between spouses the risk that the pension may never be paid.

*Id.* at 90 (internal citations omitted). We then modified the decree to provide

when and if [the pensioner] commences to receive his pension he shall pay to [the spouse] an amount equal to fifty percent of a fraction of his pension; the numerator of the fraction being twenty-three years, the number of years [the pensioner] worked for [his employer] during the marriage, the years of marriage, and the denominator of the fraction being the total number of years during which benefits were accumulated prior to being paid.

*Id.* The language in the Colarusso's decree is virtually identical.

In *Oler*, this court modified the division of the wife's IPERS benefits

to provide when and if [the pensioner] commences to receive her [benefits] she shall pay to [the spouse] an amount equal to fifty percent of a fraction of her benefits, the numerator of the fraction being fourteen years, the number of years [the pensioner] worked during the marriage, and the denominator of the fraction being the total number of years during which benefits were accumulated prior to being paid.

451 N.W.2d at 12. Again, this language is virtually the same as the Colarusso decree. But, unfortunately, the *Woodward*, *Curfman*, and *Oler* line of cases provide no beacon of guidance to us, as they are aphotic concerning the question here; At which time is the "value" of the benefit to be set for purposes of calculating the equation? So, looking only at pre-1990 cases, we are left without a paddle in murky uncharted waters.

The valuation question we face today was addressed by the *Benson* court in 1996 under very similar circumstances. *See* 545 N.W.2d at 255. There, like here, the district court utilized the percentage method when dividing the pensioner's pension benefits, and fashioning a formula not unlike the formulas used in *Woodward*, *Curfman*, *Oler*, and here. *See id.* Robert, the pensioner,

asserted the formula was faulty in that it enabled his ex-spouse, Camy, to receive a percentage of any post-dissolution increases in pension benefits—increases to which he claimed he alone was entitled. *See id.* at 256. He maintained the court should have awarded Camy only a percentage of the pension plan's present value at the date of trial. *See id.* Camy pointed out "that the more years Robert works beyond the dissolution, the smaller the fraction becomes which is used to compute her share of the benefits."[7] *Id.* The court agreed that

> [u]nder the percentage method, Robert receives an advantage because payment of Camy's share of his pension is deferred until his benefits mature. Because payment is deferred, if [the court] "lock[ed] in" the value of Camy's interest at the time of dissolution, it would prevent her from earning a reasonable return on her interest.

*Id.* at 257. In order to prevent this inequity, the court found it "preferable to set the value of the benefit for purposes of the equation at the time of maturity." *Id.* After an explanation, the court held that "[f]or the purposes of calculation under the percentage method, we think the value of the pension benefit is to be determined at the time of maturity (here retirement). We therefore hold the trial court was correct in employing this method." *Id.*

We are in the same boat as the *Benson* court. Although the *Benson* holding was not available to the decretal court, we are not required to turn a blind eye to *Benson's* analysis, for even without *Benson*, we would employ the same

---

[7] This can be illustrated by the following example. If Joseph retired at the time of the 1990 dissolution, the marital-portion fraction would have been 19/19 (number of years of marriage Joseph worked for the government/number of years during which pension benefits were accumulated prior to being paid). If, for example, Karyl's forty-percent share was $1000 per month, she would have been entitled to $1000/month in 1990 ($1000 x 19/19 = $1000). Joseph worked another twenty-two years and retired in 2012. The fraction would now be 19/41. So, if the value of Karyl's forty-percent share of the monthly benefit was fixed at $1000 at the time of dissolution, her benefit would be reduced to $463.41 a month in 2012 ($1000 x 19/41 = $463.41), even though her share of the pension would have presumably grown over the twenty-two post-dissolution years.

analysis and reach the same conclusion. There being no reason to reinvent the wheel, we adopt *Benson's* persuasive analysis and apply it to the case before us. Consequently, in construing the parties' decree, we find that the value of the pension benefit should be determined at the time of Joseph's retirement in 2012. In fixing the value of the pension benefit as of January 30, 1990, the QDRO does not correctly reflect the intent of the decree's provision for division and disposition of Joseph's retirement benefits. The district court was mistaken in holding otherwise. The question now becomes, what do we do about it?

We are sitting as a court of equity. "A court of equity is a court of conscience; it seeks to do justice and equity between all parties; it seeks to strike a balance of convenience as between litigants; and it looks at the whole situation." *In re Marriage of Williams*, 199 N.W.2d 339, 350 (Iowa 1972). Thus, "the equities on both sides are to be considered." *Id.* To that end, a court "of equity may exercise broad powers in applying equitable principles." *In re Marriage of Gallagher*, 539 N.W.2d 479, 481 (Iowa 1995). "The court sitting in equity has the power and flexibility to impose equitable terms upon parties as conditions of granting equitable relief." *In re Marriage of Zeliadt*, 390 N.W.2d 117, 120 (Iowa 1986). "Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation, though no similar relief has been given before." *Moser v. Thorp Sales Corp.*, 312 N.W.2d 881, 893 (Iowa 1981) (citation and internal quotation marks omitted).

Karyl's attorney drafted the QDRO. Some years later, when Joseph was planning his retirement, he sought the services of an attorney. That attorney

telephoned both of the parties' dissolution attorneys. Both agreed that it was their interpretation of the QDRO that Joseph's interest was to be determined as of the date of the decree, not the date of his retirement. According to Joseph, he relied on that information and the QDRO's language in making his retirement plans. Joseph retired in September 2011. His pension went into "pay status," and the parties began collecting benefits pursuant to the provisions of the QDRO. Years later, in April 2014, Karyl filed a motion requesting entry of an amended QDRO and, for the first time, asserted the language in the original QDRO was "incorrect." Considering the equities on both sides, and the unique facts of this case, we agree with the district court that "[i]t is only fair to divide the value of the pension at the time of the decree." Under all the circumstances, it would be unfair to reverse course at this late date. We therefore affirm the district court's denial of Karyl's motion.

### C. Appellate Attorney Fees.

Joseph asks this court to award him appellate attorney fees. Such an award rests in our discretion and is based on the merits of the appeal, the parties' needs, and their ability to pay. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). After considering all appropriate factors, we decline to award appellate attorney fees. Each party should be responsible for his or her own attorney fees. Karyl is assessed the costs of this appeal.

### III. Conclusion.

Although we conclude the district court was mistaken in holding the 1999 QDRO correctly reflected the intent of the decree's provision for division and disposition of Joseph's retirement benefits, considering the equities on both sides

and the unique facts of this case, we agree with the district court that to modify the QDRO now would be inequitable. Accordingly, we affirm the district court's denial of Karyl's motion. Each party should be responsible for his or her own attorney fees. Karyl is assessed the costs of this appeal.

**AFFIRMED.**

Bower, J., concurs; Mullins, J., concurs in part and dissents in part.

**MULLINS, Judge.** (concurring in part and dissenting in part)

I write separately to concur in part and dissent in part. I concur in the thorough and well-reasoned analysis of the law applicable to the pension issue and concur with the decision concerning appellate attorney fees. I dissent from the conclusion that the equities on both sides require a result that was based on misunderstandings of existing legal principles. I would conclude that the application of the law as analyzed by the majority opinion would render an equitable result, notwithstanding the administrative problems that would have to be untangled. I would reverse and remand.